# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| KEVIN J. MATTSON, | ) | Chapter 7 |
| | ) | Case No. 24-20188 PGC |
| Debtor. | ) | |
| _____ | ) | |
| MONTRESOR LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 25-_____ |
| v. | ) | |
| | ) | |
| KEVIN J. MATTSON, | ) | |
| | ) | |
| Defendant/Debtor. | ) | |

## ADVERSARY PROCEEDING COMPLAINT OBJECTING TO DISCHARGE OF DEBTOR PURSUANT TO 11 U.S.C. § 727(a)(2) – (7)

NOW COMES Plaintiff/Creditor, Montresor LLC ("Montresor" or "Plaintiff"), and objects to the granting of a discharge to Debtor/Defendant, Kevin J. Mattson ("Debtor" or "Defendant"), in his Chapter 7 case, pursuant to 11 U.S.C. § 727(a)(2) – (7) and (c)(1), Federal Rules of Bankruptcy Procedure 4007, 7001, 7003, and 7008, D. Me. LBR 7003-1.

### Constitutional and Statutory Authority, Jurisdiction, and Venue

1.      The Bankruptcy Court possesses Constitutional authority to issue final orders and judgments in this Adversary Proceeding, it has jurisdiction pursuant to 28 U.S.C. § 1334(b), this is a statutorily-core proceeding under 28 U.S.C. § 157(b)(2)(B), (J), and (O), and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      Plaintiff consents to the entry of final orders or judgments by the Bankruptcy Court in this Adversary Proceeding.  This Adversary Proceeding relates and is in reference to the Chapter 7 case of Debtor pending in the United States Bankruptcy Court for the District of Maine entitled, Kevin J. Mattson, Ch. 7, Case No. 24-20188 PGC.

## Parties

3.      Plaintiff Montresor is a Maine limited liability company with a place of business in Portland, Cumberland County, Maine.

4.      Defendant/Debtor is an individual residing in Freeport, Cumberland County, Maine.

## Facts Common to All Counts

### Mattson Chapter 7 Case

5.      On September 12, 2024 ("Filing Date"), a number of petitioning creditors commenced an involuntary Chapter 7 proceeding against Debtor through the filing of a Chapter 7 Involuntary Petition Against an Individual ("Involuntary Petition").

6.      Petitioning creditors filed the Involuntary Petition against Debtor under Chapter 7 of the United States Bankruptcy Code (the "Code") for one purpose in particular – given Debtor's historic lack of transparency regarding his financial transactions, affairs, and assets, the only way for petitioning creditors to understand Debtor's true financial condition and have a reasonable chance at recovery on their claims was to remove Debtor from any control over the financial disclosure and payment processes.

7.      On October 10, 2024, the Bankruptcy Court issued its Order for Relief in an Involuntary Case.

8.      On October 23, 2024, at Debtor's request, the Bankruptcy Court issued its Order Granting Motion to Convert, thereby converting Debtor's Chapter 7 case to one under Chapter 11 of the Code.

9.      On October 31, 2024, Debtor filed his Schedules ("Schedules") and Statement of Financial Affairs ("SOFA").

10.     On November 26, 2024, Debtor amended his Schedules.

11.     On December 6, 2024, Debtor filed a Statement, consisting of Debtor's American Express Rewards Checking Statement (Account No. xx9648) ("Amex Checking Account"), regarding his Debtor October MOR.

12.     On February 11, 2025, upon motion of the United States Trustee ("UST"), the Bankruptcy Court issued its Order re-converting Debtor's Chapter 11 case to a case under Chapter 7 of the Code.

13.     On February 25, 2025, Debtor filed his further amended Schedules ("Amended Schedules") and amended Statement of Financial Affairs ("Amended SOFA").

**Waterville Redevelopment Company IV, LLC, Ch. 11, Case No. 24-10027 MAF**

14.     On February 27, 2024, Waterville Redevelopment Company IV, LLC ("WRC IV") commenced a voluntary proceeding under Chapter 11 of the Code.

15.     Debtor is the sole manager of WRC IV.

16.     On Debtor's Schedule A/B and his Amended Schedule A/B, he states that he owns 0% of WRC IV.

17.     On March 12, 2024, WRC IV filed its Schedules ("WRC IV Schedules") and Statement of Financial Affairs ("WRC IV SOFA").

18.     According to WRC IV's Schedules and its List of Equity Security Holders, Debtor owns 4,410 units of Class A membership units in WRC IV.

19.     On September 19, 2024, the Bankruptcy Court issued its Order granting the UST's Motion to Dismiss WRC IV's Chapter 11 case pursuant to § 1112(b)(4) of the Code.

20.     WRC IV does not list Debtor, The ROTM Lofts, LLC ("ROTM"), Waterville Redevelopment Company III, LLC ("WRC III"), 45 Church Street, LLC ("45 Church Street"), or Dirigo Global Holdings, LLC ("DGH") as creditors on its WRC IV Schedules.

**Dirigo Global Holdings, LLC, Ch. 11, Case No. 24-10084 MAF**

21.     On April 24, 2024, DGH commenced a voluntary proceeding under Chapter 11 of the Code.

22.     Debtor is a manager and a member of DGH.

23.     On Debtor's Schedule A/B and his Amended Schedule A/B, he states that he owns 51% of DGH.

24.     On May 6, 2024, DGH filed its Schedules ("DGH Schedules") and Statement of Financial Affairs ("DGH SOFA").

25.     On May 22, 2024, DGH filed its Amended Schedules ("DGH Amended Schedules").

26.     On June 26, 2024, DGH filed its further Amended Schedules.

27.     On June 27, 2024, DGH filed its further Amended Schedules.

28.     Pursuant to DGH's Amended List of Equity Security Holders, Debtor owns 51% of the membership interests in DGH.

29.     DGH does not list Debtor, ROTM, WRC III, 45 Church Street, or WRC IV as creditors on its DGH Schedules.

30.     According to its DGH SOFA, DGH made payments and transfers to Debtor in at least the total amount of $56,200 between April 24, 2023 and April 24, 2024 (collectively, the "DGH/Debtor Transfers").

31.     On January 17, 2025, the Bankruptcy Court issued its Order dismissing DGH's Chapter 11 case.

**45 Church Street, LLC, Ch. 11, Case No. 24-10134 MAF**

32.     On June 28, 2024, 45 Church Street commenced a voluntary proceeding under Chapter 11 of the Code.

33.     Debtor is the sole manager and sole member of 45 Church Street.

4

34.     On Debtor's Schedule A/B and his Amended Schedule A/B, Debtor states that he is the 100% owner of 45 Church Street.

35.     On July 12, 2024, 45 Church Street filed its Schedules ("45 Church Street Schedules") and Statement of Financial Affairs ("45 Church Street SOFA").

36.     Pursuant to 45 Church Street's Schedules and List of Equity Security Holders, Debtor owns 100% of the membership units in 45 Church Street.

37.     45 Church Street does not list Debtor, ROTM, WRC III, DGH, or WRC IV as a creditor on its 45 Church Street Schedules.

38.     According to its 45 Church Street SOFA, 45 Church Street made payments and transfers to Debtor in at least the total amount of $15,900 between June 28, 2023 and June 28, 2024 (collectively, the "45 Church Street/Debtor Transfers").

39.     On November 7, 2024, the Bankruptcy Court issued its Order dismissing 45 Church Street's Chapter 11 case.

**The ROTM Lofts, LLC, Ch. 11, Case No. 24-10257 MAF**

40.      On November 21, 2024, ROTM filed a voluntary petition under Chapter 11 of the Code.

41.      Debtor is an indirect member and former manager of ROTM.

42.     On Debtor's Schedule A/B, he states that he is the 34% owner of ROTM.

43.     On December 12, 2024, ROTM filed its Schedules ("ROTM Schedules") and Statement of Financial Affairs ("ROTM SOFA").

44.     Pursuant to ROTM's Schedules and Corporate Ownership Statement, Debtor owns 10% of the membership units in ROTM through Dirigo Capital Advisors, LLC ("DCA") and Dirigo Capital Strategies, LLC ("DCS").

45.    ROTM does not list Debtor, 45 Church Street, WRC III, DGH, or WRC IV as creditors on its ROTM Schedules.

46.    According to its ROTM SOFA, ROTM made payments and transfers to Debtor in at least the total amount of $32,391.90 between November 21, 2023 and November 21, 2024 (collectively, "ROTM/Debtor Transfers").

47.    According to its ROTM SOFA, ROTM made payments and transfers to Northeast Asset Management, LLC ("NAM") (Debtor's solely owned company) in at least the total amount of $222,080.49 between November 21, 2023 and November 21, 2024 (collectively, "ROTM/NAM Transfers").

48.    According to its ROTM SOFA, ROTM made payments and transfers to DGH in at least the total amount of $54,230 between November 21, 2023 and November 21, 2024 (collectively, "ROTM/DGH Transfers").

49.    According to its ROTM SOFA, ROTM made payments and transfers to Geoffrey Houghton ("Houghton") in at least the total amount of $79,800 between November 21, 2023 and November 21, 2024 (collectively, "ROTM/Houghton Transfers").

50.    According to its ROTM SOFA, ROTM made payments and transfers to 333 Water Street QOZ, LLC ("333 Water Street QOZ") in at least the total amount of $44,880 between November 21, 2023 and November 21, 2024 (collectively, "ROTM/333 Water Street QOZ Transfers").

51.    According to its ROTM SOFA, ROTM made payments and transfers to American Express in at least the total amount of $56,713.56 between November 21, 2023 and November 21, 2024 (collectively, "ROTM/American Express Transfers").

52.    According to its ROTM SOFA, ROTM made payments and transfers to Island Brewing, LLC ("Island Brewing") in at least the total amount of $24,000 between November 21,

2023 and November 21, 2024 (collectively, "ROTM/Island Brewing Transfers").

53.     According to its ROTM SOFA, ROTM made payments and transfers to DCA in at least the total amount of $750 between November 21, 2023 and November 21, 2024 (collectively, "ROTM/DCA Transfers").

54.     ROTM does not list NAM, DCA, American Express, Island Brewing, or 333 Water Street QOZ as creditors on its ROTM Schedules.

55.     Debtor is listed as an unsecured creditor on ROTM's Schedule E/F in the amount of $100,000.

56.     On his Schedules and Amended Schedules, Debtor does not list any amounts due from ROTM.

**Waterville Redevelopment Company III, LLC, Ch. 11, Case No. 24-10265 PGC**

57.     On December 2, 2024, WRC III ("WRC III") commenced a voluntary proceeding under Chapter 11 of the Code.

58.     Debtor is a manager and indirect member of WRC III.

59.     On Debtor's Schedule A/B, he states that he is the 100% owner of WRC III.

60.     Pursuant to WRC III's Schedules and List of Equity Security Holders, Seton Holdings, LLC owns 100% of the membership units in WRC III.

61.     On December 27, 2024, WRC III filed its Schedules ("WRC III Schedules") and Statement of Financial Affairs ("WRC III SOFA").

62.     WRC III does not list Debtor, 45 Church Street, ROTM, DGH, or WRC IV as a creditor on its WRC III Schedules.

63.     On February 11, 2025, the Bankruptcy Court issued its Order dismissing WRC III's Chapter 11 case.

**Loan Sale Agreement Between SW Legacy, LLC and Montresor**

64.    Prior to the commencement of Debtor's involuntary Chapter 7 case, on August 11, 2022, Hailcore, LLC ("Hailcore"), through its manager, Jeanne Mattson (Debtor's spouse) ("Jeanne"), executed and delivered to SW Legacy, LLC ("Legacy"), *inter alia*, a certain Promissory Note in the original principal amount of $450,000 ("Original Note").

65.    On August 22, 2022, Debtor executed and delivered to Legacy a certain Guaranty Agreement ("Guaranty"), whereby Debtor guaranteed to Legacy and its successors and assigns the full and prompt payment when due, whether by acceleration or otherwise, of all the obligations due under the Note (defined herein), together with all other obligations of Hailcore to Legacy, including all attorneys' fees, costs and expenses of collection and bankruptcy.

66.    On September 18, 2023, Hailcore, through its manager, Jeanne, executed and delivered to Legacy a certain Amended and Restated Promissory Note in the original principal amount of $450,000 ("Amended Note") (Original Note and Amended Note, together, the "Note").

67.    Hailcore defaulted, and is in default, on the terms of the Note by, *inter alia,* the failure to make all the required payments when due.

68.    Upon information and belief, on July 21, 2022, Hailcore's operating agreement was amended to change its manager from Jeanne to Debtor.

69.    On February 26, 2024, Debtor, as manager of WRC IV and Hailcore, caused Hailcore to merge with WRC IV with WRC IV as the surviving company.

70.    On February 27, 2024, WRC IV filed its Chapter 11 case.

71.    Hailcore, prior to the merger, and WRC IV, since the merger, has defaulted on the Note.

8

72.     On April 2, 2025, Montresor and Legacy entered into a certain Loan Sale Agreement, whereby Legacy assigned, transferred, and otherwise conveyed all its right, title, and interest in the "Loan Documents" to Montresor (inclusive of, *inter alia*, the Note and Guaranty).

73.     On April 7, 2025, in furtherance of Legacy's assignment of the Loan Documents to Montresor, Montresor recorded in the Cumberland County Registry of Deeds (Book 41370, Page 214) a certain Mortgage and Loan Document Assignment (dated April 1, 2025).

74.     On April 8, 2025, Montresor filed a general unsecured Proof of Claim (No. 24-1) in Debtor's bankruptcy, in the principal amount of $512,336.26, arising from the amounts due from Debtor to Montresor under the assigned and transferred Guaranty.

## **Count I**
### **[11 U.S.C. § 727(a)(2)]**

75.     Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 74 above as if fully set forth herein.

76.     Debtor, with intent to hinder, delay, or defraud one or more of his creditors, transferred, removed, or concealed, or permitted to be transferred, removed, or concealed, his property within one year before the date of the filing of the petition in his Chapter 7 case.

77.     According to Debtor's Amended SOFA, Debtor made payments and transfers to Houghton in at least the total amount of $15,600 from September 12, 2023 to the Filing Date.

78.     According to Debtor's Amended SOFA, Debtor made payments and transfers to Adam Mattson in at least the total amount of $26,800 from September 12, 2023 to the Filing Date.

79.     According to Debtor's Amended SOFA, Debtor made payments and transfers to Jeanne in at least the total amount of $53,000 from September 12, 2023 to the Filing Date.

80.     According to Debtor's Amended SOFA, Debtor made payments and transfers to ROTM in at least the total amount of $123,812 from September 12, 2023 to the Filing Date.

81.     According to Debtor's Amended SOFA, Debtor made payments and transfers to Alison Talbot in at least the total amount of $15,500 from September 12, 2023 to the Filing Date.

82.     According to Debtor's Amended SOFA, Debtor made payments and transfers to Waldorf School in at least the total amount of $42,550 from September 12, 2023 to the Filing Date.

83.     The total amount of the foregoing prepetition transfers is $277,262 (collectively, the "Prepetition Transfers").

84.     On his Amended SOFA, notwithstanding that Debtor states that he made over $277,000 in Prepetition Transfers, he also states that his annual gross income in 2024 (through September) was just $70,000.

85.     Debtor failed to receive any, or inadequate, consideration for the Prepetition Transfers.

86.     With respect to the transferees of the Prepetition Transfers, Debtor had a family, friendship, corporate, or special relationship.

87.     Debtor attempted and sought to keep the Prepetition Transfers a secret by, among things, failing to disclose them as required on his SOFA and otherwise failing to disclose the extent and scope of such transfers to, among others, the UST and creditors.

88.     At the time Debtor made the Prepetition Transfers to the transferees, Debtor was insolvent and not paying his debts and obligations as they came due, and many of the transferees' financial conditions were substantially improved as a result of the Prepetition Transfers.

89.     By making the Prepetition Transfers, Debtor engaged in a pattern or series of transactions over the course of months and even years even by which Debtor made the payments and transfers even though he was continuing to incur debts and financial obligations, was continually in financial difficulties, and was the subject of many suits and other collection efforts by creditors of Debtor.

90.     Throughout the time period of the Prepetition Transfers, Debtor continued to make payments and transfers to his family members, business partners, companies, and other insiders even though Debtor himself, and his entities, throughout 2024, were all failing financially and the subject of collection and bankruptcy proceedings.

91.     Debtor, with intent to hinder, delay, or defraud one or more of his creditors, or an officer of the estate charged with custody of property under Title 11, transferred, removed, or concealed, or permitted to be transferred, removed, or concealed, property of the estate after the date of the filing of the petition.

92.     Specifically, from the Filing Date through February 11, 2025, Debtor continued to make post-petition payments to, *inter alia,* Jeanne, Houghton, NAM, and his other entities (collectively, the "Debtor Post-Petition Transfers").

93.     Debtor failed to receive any, or inadequate, consideration for the Debtor Post-Prepetition Transfers.

94.     With respect to the transferees of the Debtor Post-Prepetition Transfers, Debtor had a family, friendship, corporate, or special relationship.

95.     Debtor attempted and sought to keep the Debtor Post-Prepetition Transfers a secret by, among things, failing to file proper Monthly Operating Reports with attached, transparent, and requisite bank account statements and records so that creditors, the UST, and this Court could readily discern and understand Debtor's post-petition use of his funds.

96.     At the time Debtor made the Debtor Post-Prepetition Transfers to the transferees, Debtor was insolvent and not paying his debts and obligations as they came due, and many of the transferees' financial conditions were substantially improved as a result of the Debtor Post-Prepetition Transfers.

97.     By making the Debtor Post-Prepetition Transfers, Debtor engaged in a continued pattern or series of transactions over the course of months by which Debtor made the payments and transfers even though he was continuing to incur debts and financial obligations, was continually in financial difficulties, and was in Chapter 11.

98.     Throughout the time period of the Debtor Post-Prepetition Transfers, Debtor continued to make payments and transfers to his family members, business partners, companies, and other insiders even though Debtor himself, and his entities, throughout 2024, were all failing financially and the subject of collection and bankruptcy proceedings.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

i.    Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count I of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(2); and

ii.   Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

### Count II
### [11 U.S.C. § 727(a)(3)]

99.     Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 98 above as if fully set forth herein.

100.    Debtor has concealed, falsified, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which Debtor's financial condition or business transactions might be ascertained.

101.    On October 24, 2024, Debtor participated in an initial debtor interview ("IDI") with the UST.  During the IDI, the UST reviewed the Operating Guidelines with Debtor for Chapter 11 cases and their requirements.  Debtor was specifically informed at the IDI of his obligation to close all prepetition bank accounts and to open new accounts with an authorized depository.

102.     On October 31, 2024, Debtor filed his Schedules and SOFA.  The Schedules and SOFA are rife with errors.

103.     Debtor states on Schedule A/B that he has no bank accounts, which was and is false.

104.     On the Filing Date, Debtor had at least two bank accounts.

105.     On his Schedule A/B, Debtor reports ownership interests in fourteen limited liability companies (the "LLCs"), five of which he personally authorized to file Chapter 11 cases.  Debtor failed to provide a value for any of the LLCs.

106.     Debtor's Schedules list over $37 million dollars in secured debt, but the information Debtor provides about these claims is deficient.  Debtor fails to indicate what collateral secures his Schedule D claims.  With respect to the claims that identify the collateral securing them, Debtor does not appear to personally own the collateral (because none of it is listed on Schedule A/B) and there is no evidence that Debtor's guarantees are secured.

107.     On his Schedules, Debtor lists $369,325.77 in unsecured debt.

108.     Debtor reports that he is engaged in the business of "real estate management."  Debtor is the managing member of an entity wholly owned by him, NAM.

109.     From November 7, 2024 to February 4, 2025 (*i.e.*, during Debtor's case), NAM was an administratively dissolved entity.

110.     On his Schedule I, Debtor reports monthly gross wages or income of $10,000 from NAM, and monthly net wages of $10,000.

111.     During his case, however, Debtor produced bank account statements from the Amex Checking Account that show that, in the two months prior to the Filing Date, Debtor personally received payments from various entities, including but not limited to NAM, totaling $141,950 (August 2024) and $127,600.96 (September 2024), for a total of $269,550.96 in just two months.

112.    Based upon his Amex Checking Account, Debtor appears to commingle personal income with that of the LLCs.

113.    Debtor failed to close the Amex Checking Account upon conversion of his case to Chapter 11 as he was required to do.  Debtor never opened a debtor-in-possession bank account with an authorized depository during his Chapter 11 case.

114.    At no time post-petition have the UST or Debtor's creditors been able to verify Debtor's post-petition, post-account closures and personal financial transactions.

115.    On December 3, 2024, Debtor participated in a § 341 Meeting of Creditors ("Section 341 Meeting").

116.    At his Section 341 Meeting, the UST requested that Debtor amend his Schedules and SOFA and provide certain supplemental information to the United States Trustee.  Debtor failed to do so in a fulsome or timely manner.

117.    Debtor made it painstakingly difficult for the UST and his creditors to ascertain Debtor's true financial condition.  Debtor's Schedules and SOFA are unreliable and reflect only what has been evident in the other bankruptcy proceedings in which Debtor is involved.

118.    Debtor himself reports no sources of income other than NAM.

119.    Debtor is married to Jeanne, yet Debtor's Schedule I did not report any income attributable to Jeanne in his Chapter 11 case.

120.    The Debtor reports monthly expenses of $9,571.

121.    Pre-petition, the Debtor maintained a checking account with American Express, as well as savings account at Atlantic Federal Credit Union ("Atlantic FCU") (together, the "Prepetition Accounts").  Neither of the Prepetition Accounts was disclosed on Debtor's Schedules.

122.    On November 25, 2024, Debtor filed a monthly operating report for October 2024, but he failed to attach records from his bank account as required by the Operating Guidelines.

14

123.    On December 6, 2024, the Debtor stated under penalty of perjury that he closed the Atlantic FCU account ("Atlantic Account") on October 25, 2024, and he closed the AMEX Checking Account on December 6, 2024.  Previously, however, on October 25, 2024, Debtor informed the UST that he was in process of closing the Amex Checking Account.

124.    The UST requested that Debtor provide the identity of the sources who received outgoing payments from the Amex Checking Account.  Debtor has failed to fully comply with that request.

125.    Unless indicated on the Amex Checking Account statements, recipients of disbursements from that account are unknown.

126.    According to Debtor's Amex Checking Account, in August 2024, Debtor received $28,736 from NAM in the form of either a distribution or transfer.

127.    According to Debtor's Amex Checking Account, Debtor received $25,620 from 333 Water Street, LLC ("333 Water Street") in August 2024.

128.    According to Debtor's Amex Checking Account, Debtor received $31,000 from Island Brewing in August 2024.

129.    Upon information and belief, Debtor is a manager or member (directly or indirectly) of 333 Water Street and it is unknown why Debtor personally received payments from that company and Island Brewing.

130.    According to Debtor's Amex Checking Account, Debtor received at least one payment from ROTM for "management services" in August 2024.  It is not known why Debtor personally received payments from ROTM for "management services" (rather than the payment being made to NAM).  On his Schedule G, Debtor does not list having an executory contract with ROTM for management services.

131.   As reflected in his Amex Checking Account for September 2024, Debtor received $127,600.96 in deposits, made $125,701.25 in disbursements, leaving a cash balance of a $2,576.90 as of October 1, 2024.

132.   Debtor has not provided an explanation for the sources of income received by him other than NAM.

133.   Debtor has not provided the UST or his creditors with specific details about the October 2024 Amex Checking Account Statement.  That Statement, however, reflects that for the month of October 2024, Debtor received deposits/credits of $29,426.27 and debits of $32,003.42 that month, leaving a remaining account balance of -$0.25.

134.   Debtor answered "no" to Question 28 of his SOFA which asks whether "within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business?"  Debtor did, in fact, provide such personal financial statements to at least two creditors.

135.   Schedule A/B requires Debtor to disclose any deposits of money he had as of the Filing Date, and provides the following examples:  "Checking, savings, or other financial accounts…."  Debtor testified at his Section 341 Meeting that he misunderstood the question.

136.   Debtor has failed to file personal tax returns since 2020.

137.   During his Chapter 11 case, Debtor asserted and advanced in open Court the argument that because his bankruptcy estate was entitled to, at least, in excess of $1 million dollars in federal and state historic tax credits (collectively, the "HTC"), his case should not be converted to Chapter 7, and that he should be permitted to file a plan of reorganization to monetize the HTC for the benefit of his creditors.

138.   None of Debtor's Schedules, SOFA, Amended SOFA, or Amended Schedules list or state Debtor's entitlement, either directly or indirectly, to the HTC.

16

139.     None of the schedules or statements of financial affairs filed by DGH, WRC III, WRC IV, ROTM, or 45 Church Street list or state either their or Debtor's entitlement, either directly or indirectly, to the HTC.

140.     Debtor has failed to keep adequate personal and corporate records from which his financial affairs can be traced and transparently understood, particularly with respect to those entities in which Debtor is conducting business through closely held companies.

141.     Debtor has failed to give creditors, the Chapter 7 Trustee, the UST, and the Bankruptcy Court complete and accurate information concerning his affairs that will ensure dependable information is provided so that Debtor's financial history may be traced.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

    i.      Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count II of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(3); and

    ii.    Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

## Count III
## [11 U.S.C. § 727(a)(4)]

142.     Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 141 above as if fully set forth herein.

143.     A bankruptcy debtor's schedules and statement of financial affairs are the equivalent of a verification under oath and, therefore, misrepresentations and omissions in a debtor's schedules and statement of financial affairs qualify as false oaths for purposes of § 727(a)(4)(A) of the Code.

144.     Debtor knowingly and fraudulently, in or in connection with his case, made materially false oaths or accounts through his Schedules, SOFA, Amended Schedules, and Amended SOFA.

145.     Debtor deliberately omitted material information and disclosures on his Schedules, SOFA, Amended Schedules, and Amended SOFA.

146.    Debtor's Schedules, SOFA, Amended Schedules, and Amended SOFA are so materially inaccurate, and contain so many material omissions, that they reflect and evidence Debtor's reckless indifference to the truth of the information contained therein and are the functional equivalent of fraud on Debtor's part for purposes of § 727(a)(4)(A).

147.    Debtor's Schedule A/B lists no checking or savings accounts, but at his Section 341 Meeting of Creditors, Debtor testified that he did, in fact, have two personal checking accounts, one with American Express in particular.

148.    Debtor's Schedule I states that he receives $10,000 gross income per month from NAM (Debtor's solely owned company) for "real estate development," but according to Debtor's AMEX Checking Account for October 2024 (*i.e.*, post-petition), he received total amounts in that month alone of $29,426.27.

149.    Debtor fails to list on his SOFA a $10,000 retainer payment to Bernstein Shur on behalf of Debtor in ROTM.

150.    Debtor's Schedules and Amended Schedules fail to list a $100,000 receivable due from ROTM.

151.    Debtor's SOFA states that from January to September 2024, he received gross income of "$70,000" (and no other income from any other source aside from probate estate distributions), but ROTM's Statement of Financial Affairs (Payments to Insiders) case provides that ROTM (while controlled by Debtor) made total payments to Debtor, NAM, DGH, 333 Water Street QOZ, LLC ("333 Water Street QOZ"), Houghton, Island Brewing, and American Express as follows:

| Payee | Recipient | Payment for | Amount |
|--------|-----------|-------------|--------|
| ROTM | Debtor | "Management Fees" | $1,800 |
| ROTM | Debtor | "Loan Repayment" | $21,900 |
| ROTM | Debtor | "Misc" | $153 |
| ROTM | Debtor | "Reimbursement" | $8,538.90 |
| ROTM | NAM | "Management Fee" | $131,211.13 |
| ROTM | NAM | "Loan Repayment" | $34,666 |

18

| ROTM | NAM | "Reimbursement" | $2,530 |
| ROTM | NAM | "Developer Fee" | $48,750 |
| ROTM | NAM | "Misc" | $4,400 |
| ROTM | NAM | "Auto Reimbursement" | $523.36 |
| ROTM | DGH | "Loan Repayment" | $54,080 |
| ROTM | DGH | "Misc" | $150 |
| ROTM | Houghton | "Loan Repayment" | $79,800 |
| ROTM | 333 Water St QOZ | "Loan Repayment" | $20,600 |
| ROTM | 333 Water St QOZ | "Repayment" | $13,580 |
| ROTM | 333 Water St QOZ | "Reimbursement" | $10,700 |
| ROTM | American Express | Reimbursement | $35,200 |
| ROTM | American Express | "Credit Card Payment" | $12,813.56 |
| ROTM | American Express | "Transfer" | $8,700 |
| ROTM | Island Brewing | "Overpayment of Rent" | $24,000 |
| ROTM | Dirigo Capital Advisors, LLC | "Misc" | $750 |

<u>$514,845.95</u>

152.    According to ROTM's Statement of Financial Affairs, ROTM paid Debtor and his companies over $255,000 from January 1, 2024 to November 20, 2024.  In "Developer Fees" alone, ROTM paid NAM $48,750.  "Loan Repayment" of $21,900 is income to Debtor in 2024.  And that income is not related to his "employment" as a "property manager" through NAM, and yet, Debtor's SOFA affirmatively states that he did not receive any other income from any other sources in 2024 (other than $50,000 in probate estate distributions).  And that does not include the other $131,000 in "Management Fees" from ROTM.  ROTM also appears to have paid Debtor's personal American Express credit card another $56,000.

153.    On his Amended Schedules, Debtor lists a claim against Severin Beliveau ("<u>Beliveau</u>") for "breach of contract and fraud," even though in October 2023, Debtor executed a settlement agreement with Beliveau that fully released Beliveau from any and all claims, including any claims for breach of contract and fraud.

154.    On his Amended Schedules, Debtor lists a claim against "Randy Creswell for Slander," even though Debtor knows, and knew when he signed the Amended Schedules under

penalties of perjury, that any such claim lacked any basis in fact or law.

155.    None of Debtor's Schedules, SOFA, Amended SOFA, or Amended Schedules list or state Debtor's entitlement, either directly or indirectly, to the HTC.

156.    On his SOFA, Debtor states that he received: (i) $50,000 from an "Estate Distribution" in 2024; (ii) $100,000 from an "Estate Distribution" in 2023; and (iii) $50,000 from an "Estate Distribution" in 2022, for total distributions of $200,000.

157.    But on his Amended SOFA, Debtor states that he received: (i) $62,000 from an "Estate Distribution" in 2024; (ii) $70,000 from an "Estate Distribution" in 2023; and (iii) $185,000 from an "Estate Distribution" in 2022, for total distributions of $317,000 – $117,000 more than Debtor originally disclosed on his SOFA under penalties of perjury.

158.    Based upon the foregoing, Debtor also knowingly and fraudulently, in or in connection with his case, withheld from an officer of the estate (at least the UST, and potentially the Chapter 7 Trustee) entitled to possession under Title 11, recorded information, including books, documents, records, and papers, relating to Debtor's property or financial affairs.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

    i.    Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count III of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(4); and

    ii.    Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

## Count IV
### [11 U.S.C. § 727(a)(5)]

159.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 158 above as if fully set forth herein.

160.    On November 24, 2024, the U.S. Small Business Administration ("SBA") filed an unsecured Proof of Claim (No. 8-1) in Debtor's bankruptcy, in the principal amount of $518,697.55,

based upon a personal guaranty delivered by Debtor to SBA for money loaned directly to DCA beginning in 2017 and continuing to 2020 (an entity owned and controlled by Debtor).

161.    Upon information and belief, Debtor provided to SBA in conjunction with DCA's loan application a certain Personal Financial and Credit Statement and referenced Schedule of Real Estate Owned (dated September 15, 2017) (together, the "PFS").

162.    In his PFS provided to SBA, Debtor represented and stated that he had total assets of $7,887,735.

163.    In his PFS provided to SBA, Debtor represented and stated that he had total liabilities of $0.

164.    In his PFS provided to SBA, Debtor represented and stated that he had "Art, Gold, Coins, Furniture" with a value of $400,000.

165.    In his PFS provided to SBA, Debtor represented and stated that he had a total "Net Worth" of $7,887,735.

166.    On his Amended Schedule A/B, Debtor states that he has total assets of $21,610.23.

167.    On his Amended Schedules D and E/F, Debtor states that he has total liabilities of $37,561,301.55.

168.    Debtor has failed to explain satisfactorily the loss of his assets and/or his deficiency of assets to meet his liabilities.

169.    Specifically, Debtor has failed to explain satisfactorily the loss of his total net worth of over $7.8 million dollars in 2017 (and likely 2020) to just $21,610.23 as of the Filing Date.

170.    Debtor has failed to explain satisfactorily the loss or use of the $317,000 in "Estate Distributions" that he received between 2022 and the Filing Date.

171.    Debtor has failed to explain satisfactorily the loss, use of, and transferees of all the funds and monies deposited into, and paid from, his Amex Checking Account for the 2-year period

prior to the Filing Date.

172.    Debtor has failed to explain satisfactorily the loss, use of, and transferees of all the funds and monies deposited into, and paid from, his Atlantic Account for the 2-year period prior to the Filing Date.

173.    Debtor has failed to explain satisfactorily the loss, use of, and transferees of the $400,000 in "Art, Gold, Coins, Furniture" listed in Debtor's PFS.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

    i.    Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count IV of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(5); and

    ii.    Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

## Count V
## [11 U.S.C. § 727(a)(2) and (7) (ROTM)]

174.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 173 above as if fully set forth herein.

175.    Debtor is an insider of ROTM within the meaning of 11 U.S.C. § 101(31).

176.    At all relevant times, Debtor is and was a person in control of ROTM.

177.    Debtor has committed acts specified in 11 U.S.C. § 727(a)(2), on or within one year before the date of the filing of the petition, and/or during the case, in connection with the Chapter 11 case of ROTM.

178.    On its Schedule E/F, ROTM does not list NAM as a creditor. But according to the ROTM SOFA, ROTM made the ROTM/NAM Transfers in the amount of $222,080.49.

179.    On its Schedule E/F, ROTM does not list DGH as a creditor. But according to the ROTM SOFA, ROTM made the ROTM/DGH Transfers in the amount of $54,230.

180.   On its Schedule E/F, ROTM does not list 333 Water Street QOZ as a creditor.  But according to the ROTM SOFA, ROTM made the ROTM/333 Water Street QOZ Transfers in the amount of $44,880.

181.   On its Schedule E/F, ROTM does not list American Express as a creditor.  But according to the ROTM SOFA, ROTM made the ROTM/American Express Transfers in the amount of $56,713.56.

182.   On its Schedule E/F, ROTM does not list Island Brewing as a creditor.  But according to the ROTM SOFA, ROTM made the ROTM/Island Brewing Transfers in the amount of $24,000.

183.   On its Schedule E/F, ROTM does not list DCA as a creditor.  But according to the ROTM SOFA, ROTM made the ROTM/DCA Transfers in the amount of $750.

184.   According to the ROTM SOFA, ROTM made the ROTM/Houghton Transfers in the amount of $79,800 (the transfers alleged in ¶¶ 178 – 184 herein, collectively, the "ROTM Transfers").

185.   ROTM, with intent to hinder, delay, or defraud one or more of its creditors, transferred, removed, or concealed, or permitted to be transferred, removed, or concealed, its property, *i.e.*, the ROTM Transfers, within one year before the date of the filing of the petition in its Chapter 11 case.

186.   ROTM failed to receive any, or inadequate, consideration for the ROTM Transfers.

187.   With respect to the transferees of the ROTM Transfers, ROTM had a corporate, insider, or special relationship.

188.   At the time ROTM made the ROTM Transfers to the transferees, ROTM was insolvent and not paying its debts and obligations as they came due, and many of the transferees' financial conditions were substantially improved as a result of the ROTM Transfers.

189.   By making the ROTM Transfers, ROTM engaged in a pattern or series of transactions over the course of months and even years even by which ROTM made the payments and transfers

even though it was continuing to incur debts and financial obligations, was continually in financial difficulties, and was the subject of many suits and other collection efforts by creditors of ROTM.

190.    Throughout the time period of the ROTM Transfers, ROTM continued to make payments and transfers to its members, business partners, companies, and other insiders even though ROTM itself throughout 2023 and 2024 was failing financially and the subject of collection and bankruptcy proceedings.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

i.      Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count V of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(2) and (7); and

ii.     Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

## Count VI
### [11 U.S.C. § 727(a)(2) and (7) (45 Church Street)]

191.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 190 above as if fully set forth herein.

192.    Debtor is an insider of 45 Church Street within the meaning of 11 U.S.C. § 101(31).

193.    At all relevant times, Debtor is and was a person in control of 45 Church Street.

194.    Debtor has committed acts specified in 11 U.S.C. § 727(a)(2), on or within one year before the date of the filing of the petition, and/or during the case, in connection with the Chapter 11 case of 45 Church Street.

195.    According to its 45 Church Street SOFA, 45 Church Street made payments and transfers to Debtor in at least the total amount of $15,900 between June 28, 2023 and June 28, 2024 (collectively, the "45 Church Street/Debtor Transfers").

196.    45 Church Street, with intent to hinder, delay, or defraud one or more of its creditors, transferred, removed, or concealed, or permitted to be transferred, removed, or concealed, its

property, *i.e.*, the 45 Church Street/Debtor Transfers, within one year before the date of the filing of the petition in its Chapter 11 case.

197.    45 Church Street failed to receive any, or inadequate, consideration for the 45 Church Street/Debtor Transfers.

198.    With respect to the transferee of the 45 Church Street/Debtor Transfers, 45 Church Street had an insider and special relationship.

199.    At the time 45 Church Street made the 45 Church Street/Debtor Transfers to Debtor, 45 Church Street was insolvent and not paying its debts and obligations as they came due, and many of the transferees' financial conditions were substantially improved as a result of the 45 Church Street/Debtor Transfers.

200.    By making the 45 Church Street/Debtor Transfers, 45 Church Street engaged in a pattern or series of transactions over the course of months and even years even by which 45 Church Street made the payments and transfers even though it was continuing to incur debts and financial obligations, was continually in financial difficulties, and was the subject of many suits and other collection efforts by creditors of 45 Church Street.

201.    Throughout the time period of the 45 Church Street/Debtor Transfers, 45 Church Street continued to make payments and transfers to its member and insider even though 45 Church Street itself throughout 2023 and 2024 was failing financially and the subject of collection and bankruptcy proceedings.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

    i.     Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count VI of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(2) and (7); and

    ii.    Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

**Count VII**
**[11 U.S.C. § 727(a)(3) and (7) (WRC III)]**

202.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 201 above as if fully set forth herein.

203.    Debtor is an insider of WRC III within the meaning of 11 U.S.C. § 101(31).

204.    At all relevant times, Debtor is and was a person in control of WRC III.

205.    Debtor has committed acts specified in 11 U.S.C. § 727(a)(3), on or within one year before the date of the filing of the petition, and/or during the case, in connection with the Chapter 11 case of WRC III.

206.    WRC III concealed, falsified, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which WRC III's financial condition or business transactions could be ascertained.

207.    During its Chapter 11 case, WRC III asserted and advanced in open Court the argument that because its bankruptcy estate was entitled to, at least, in excess of $1 million dollars in federal and state historic tax credits (*i.e.*, the HTC), its case should not be dismissed or converted to Chapter 7, and that it should be permitted to file a plan of reorganization to monetize the HTC for the benefit of its creditors.

208.    None of WRC III's Schedules or SOFA list or state WRC's entitlement, either directly or indirectly, to the HTC.

209.    WRC III failed to keep adequate corporate records from which its financial affairs could be traced and transparently understood, particularly with respect to other entities in which Debtor was conducting business through closely held companies.

210.    WRC III failed to give creditors, the Chapter 7 Trustee, the UST, and the Bankruptcy Court complete and accurate information concerning its affairs that would ensure dependable information was provided so that WRC III's financial history could be traced.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

i.    Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count VII of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(3) and (7); and

ii.    Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

## Count VIII
### [11 U.S.C. § 727(a)(4) and (7) (WRC III)]

211.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 210 above as if fully set forth herein.

212.    Debtor has committed acts specified in 11 U.S.C. § 727(a)(4), on or within one year before the date of the filing of the petition, and/or during the case, in connection with the Chapter 11 case of WRC III.

213.    WRC III knowingly and fraudulently, in or in connection with its case, made materially false oaths or accounts through its Schedules and SOFA.

214.    WRC III deliberately omitted material information and disclosures on its Schedules and SOFA.

215.    WRC III's Schedules and SOFA are so materially inaccurate, and contain so many material omissions, that they reflect and evidence WRC III's reckless indifference to the truth of the information contained therein and are the functional equivalent of fraud on WRC III's part for purposes of § 727(a)(4)(A).

216.    WRC III's Schedules and SOFA fail to list or state WRC III's entitlement, either directly or indirectly, to the HTC.

217.    Based upon the foregoing, WRC III also knowingly and fraudulently, in or in connection with its case, withheld from an officer of the estate (the UST) entitled to possession under Title 11, recorded information, including books, documents, records, and papers, relating to WRC III's property or financial affairs.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

    i.    Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count VIII of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(4) and (7); and

    ii.    Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

### Count IX
### [11 U.S.C. § 727(a)(2) and (7) (WRC IV)]

218.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 217 above as if fully set forth herein.

219.    Debtor is an insider of WRC IV within the meaning of 11 U.S.C. § 101(31).

220.    At all relevant times, Debtor is and was a person in control of WRC IV.

221.    Debtor has committed acts specified in 11 U.S.C. § 727(a)(2), on or within one year before the date of the filing of the petition, and/or during the case, in connection with the Chapter 11 case of WRC IV.

222.    WRC IV, with intent to hinder, delay, or defraud one or more of its creditors, transferred, removed, or concealed, or permitted to be transferred, removed, or concealed, its property, within one year before the date of the filing of the petition in its Chapter 11 case.

223.    Specifically, on February 26, 2024, Debtor, as manager of WRC IV and Hailcore, caused Hailcore to merge with WRC IV with WRC IV as the surviving company (the "Merger").

224.    Debtor and WRC IV orchestrated and effectuated the Merger of Hailcore and WRC IV for the purpose of hindering and delaying Legacy's foreclosure and auction of Hailcore's assets.

225.    Following the Merger, on February 27, 2024, WRC IV filed its Chapter 11 case.

226.    WRC IV failed to receive any, or inadequate, consideration for the Merger.

227.    With respect to the Merger, WRC IV had an insider and special relationship with Debtor and Hailcore.

228.    At the time WRC IV orchestrated and effectuated the Merger, WRC IV was insolvent and not paying its debts and obligations as they came due.

229.    Before and after the Merger, WRC IV was failing financially and the subject of collection and bankruptcy proceedings.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

    i.    Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count IX of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(2) and (7); and

    ii.    Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

### Count X
### [11 U.S.C. § 727(a)(2) – (7) (DGH)]

230.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 229 above as if fully set forth herein.

231.    Debtor is an insider of DGH within the meaning of 11 U.S.C. § 101(31).

232.    At all relevant times, Debtor is and was a person in control of DGH.

233.    Debtor has committed acts specified in 11 U.S.C. § 727(a)(2), on or within one year before the date of the filing of the petition, and/or during the case, in connection with the Chapter 11 case of DGH.

234.    According to its DGH SOFA, DGH made payments and transfers to Debtor in at least the total amount of $56,200 between April 24, 2023 and April 24, 2024 (collectively, the "DGH/Debtor Transfers").

235.   DGH, with intent to hinder, delay, or defraud one or more of its creditors, transferred, removed, or concealed, or permitted to be transferred, removed, or concealed, its property, *i.e.*, the DGH/Debtor Transfers, within one year before the date of the filing of the petition in its Chapter 11 case.

236.   DGH failed to receive any, or inadequate, consideration for the DGH/Debtor Transfers.

237.   With respect to the transferee of the DGH/Debtor Transfers, DGH had an insider and special relationship.

238.   At the time DGH made the DGH/Debtor Transfers to Debtor, DGH was insolvent and not paying its debts and obligations as they came due, and many of the transferees' financial conditions were substantially improved as a result of the DGH/Debtor Transfers.

239.   By making the DGH/Debtor Transfers, DGH engaged in a pattern or series of transactions over the course of months and even years even by which DGH made the payments and transfers even though it was continuing to incur debts and financial obligations, was continually in financial difficulties, and was the subject of many suits and other collection efforts by creditors of DGH.

240.   Throughout the time period of the DGH/Debtor Transfers, DGH continued to make payments and transfers to its member and insider even though DGH itself throughout 2023 and 2024 was failing financially and the subject of collection and bankruptcy proceedings.

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

    i.    Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count X of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(2) and (7); and

    ii.    Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

## Count XI
### [11 U.S.C. § 727(a)(6) and (7) (ROTM)]

241.    Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 – 240 above as if fully set forth herein.

242.    Debtor is an insider of ROTM within the meaning of 11 U.S.C. § 101(31).

243.    At all relevant times, Debtor is and was a person in control of ROTM.

244.    Debtor has committed acts specified in 11 U.S.C. § 727(a)(6), on or within one year before the date of the filing of the petition, and/or during the case, in connection with the Chapter 11 case of ROTM.

245.    ROTM has refused in its Chapter 11 case to obey a lawful order of the Bankruptcy Court, which order does not require ROTM to respond to a material question or to testify on any privileged or other grounds set forth in 11 U.S.C § 727(a)(6)(B) – (C).

246.    On November 21, 2024, ROTM filed in its Chapter 11 case a Motion to Use Cash Collateral.

247.    On December 2, 2024, the Bankruptcy Court issued its Order granting ROTM's use of cash collateral on an interim basis and based upon certain terms and conditions.

248.    On January 21, 2025, ROTM filed an application to employ Dominion Management Services LLC ("Dominion") as financial advisor for ROTM and to effectively replace NAM as property manager for ROTM.  ROTM filed the application to employ in order to replace NAM and Debtor as financial advisors and property managers for ROTM because NAM and Debtor were, and had been for years, fleecing ROTM monetarily for Debtor's own personal gain and benefit.

249.    On January 31, 2025, the Bankruptcy Court issued its Order approving the retention of Dominion as financial advisor for ROTM.

250.    On March 11, 2025, the Bankruptcy Court issued its final cash collateral Order in ROTM's Chapter 11 case.  Paragraph 2 of the Bankruptcy Court's final cash collateral Order provides, *inter alia*, that "no payments in the category of 'Maintenance and Repairs' shall be paid to Northeast Asset Management or any other insider of the Debtor."

251.    Pursuant to ROTM's Monthly Operating Report for March 2025, ROTM made the following payments to NAM during March 2025:  (i) $700 to NAM for leasing fees; (ii) $504 to NAM for leasing fees; (iii) $504 to NAM for leasing fees; (iv) $4,500 to NAM for management fees; (v) $6,000 to NAM for maintenance and repairs; and (vi) $1,600 to NAM for management fees and leasing fees, for total unauthorized payments from ROTM to NAM, and in violation of the Court's final cash collateral Order, in the amount of $13,808 (collectively, the "ROTM/NAM Payments").

WHEREFORE, Plaintiff, Montresor LLC, requests that this Court:

    i.      Grant judgment in its favor and against Debtor/Defendant, Kevin J. Mattson, on Count XI of this Complaint and deny Debtor a discharge in his Chapter 7 case to pursuant to 11 U.S.C. § 727(a)(6) and (7); and

    ii.     Grant Plaintiff such other and further relief as is just and equitable under the circumstances.

Dated at Portland, Maine this 5th day of May, 2025.

/s/ Randy J. Creswell
Randy J. Creswell, Esq.
Counsel for Plaintiff/Creditor,
Montresor LLC

CRESWELLLAW
PO Box 7340
Portland, ME 04112
(207) 358-1010
rcreswell@creswelllaw.com